Good morning, Your Honors. May it please the Court, I'm Sharon Arkin for Plaintiffs & Appellants. I know we're here primarily because somebody has questions for us. It's primarily that we're going to have questions for you, but we don't mind you making argument before we get to the questions. But usually you start into it and one of us says, no, let's talk about this. So you give it to us the way you'd like. Okay, well, I'd like to save three minutes for a rebuttal. Okay, three minutes. And because time is limited, I'll just start. And please give me your questions as soon as you can because I want to make sure we get to them. It seems to me we have four different people who you're representing. Yes, sir. And as to Gonzales, it's my understanding the Navy granted Gonzales an alternative PAT, right? They did. And they also gave him different kind of watches to accommodate his diabetes. They did. So, and I understood Gonzales took them. He did. And he remained employed. He did. Well, those are the only requests in front of us, aren't they? Well, not exactly. The settlement of subsequent problems isn't before us. That's correct. But the issue for him is the accommodation process itself. It was not. And last time when I was going through everything, I would exhort you to read his declaration. I've read his declaration. And I tried to apply the law, if you will, as it is here. He's got to give me three different things. One, he has a disability. I think that's pretty well given. Otherwise qualified, I don't think we're arguing about that. But adverse action because of the disability, I don't think he can make it. Well, adverse action under the law is under Harris versus forklift designs, isn't just you're fired or you're on leave or it's not a hard and fast rule. It has to be applied sort of organically. And it's interfering with the incidence of employment. And that's what they did. He's been through the RA process for years, starting in 2012. The last few years when the new ones got added, the new descriptions got added, position descriptions were changed, he got even more problems with trying to deal with the RA process. He was in, he was out. I understand that. If I don't agree with that. I understand. Then we can move on, right? Yes. That's your best argument? Yes. Okay. Take up another one. Let's take up, you tell me which other one. As to Gatling, for instance, wasn't he given another equivalent assignment? Well, it was not anything equivalent. No, but he doesn't have to have the same assignment. No, I understand. All he has to have is an alternative assignment. And as I understand it, he not only got the alternative assignment, but he was guaranteed that he'd never make less. I understand. And then he argues he'd never been given any pay grade increases in that position, but he also has never asked for an accommodation about that. Well, if it was already promised, why would he ask for an accommodation? Well, I don't know if in fact it's true, and I'm just taking it as he said. It seems to me that the first thing he would do is say, well, you're not doing what you said and I want an accommodation. Or I want to fight about it. I mean, he's saying I want to fight about it, but the Rehabilitation Act doesn't require the NAMI to allow him to have the same position. Okay. But the predicate for that conclusion is that he's gotten an accommodation, is that what forced him into accommodations was a valid essential function requirement, and that to me is the heart of this case. Those functions that were added to the PD were not. Well, you're really talking about the second prong you have to prove otherwise qualified, because you're saying that the qualifications were trumped up. But what you have to prove is you have to have a proof of a person with a disability, which I don't think anybody questions, but then that there was an adverse action because of the disability. And that's the one I'm – I don't want to talk about the second one, but there was adverse action because of the disability. You mean for Mr. Gatling? Yeah. But my point is if the essential function additions to – or if the additional requirements added to the position description were not essential functions, they cannot be applied. He should not have been – But that just talks about otherwise qualified. That's the second prong. But he doesn't have – The third prong is that he had an adverse action because of his disability. He did not. I mean, there's no evidence that he did. He got another job. He got a pay increase. He got everything he wanted. That's your best argument? Let me finish. Okay. The problem with that analysis is, right, if those weren't essential functions, he wasn't a qualified individual, and he shouldn't have been put into RA, and he shouldn't have been demoted. I understand that. Counsel, is Judge Gould, and I have a question. Yes, sir. If I may. Have you heard – have the parties here gone through a mediation under the court's auspices? Yes, we did. Yes, sir. Is it enough having heard what you've heard so far today? Is there any chance, if we ask you to mediate again, that this matter could be resolved by agreement? I'm sorry. I'm going to ask co-counsel to respond to that, if I may. Because I would do that. I'll let you. She can just talk if she wants to, since she's co-counsel. May it please the Court, Nancy Dumanian for the appellants. Your Honor, we did have a mediation with our magistrate judge. Obviously, it didn't result in resolution. We're always happy to discuss that again, and we're always ready and willing and available to listen and to talk, Your Honor. Is that your answer to your question, Judge Gould? Yes, I think so. Do you have any other questions you want to give right now? I don't, Your Honor. Thank you. Thank you so much, Your Honors. I apologize. All right. We're now going to the other two. Okay. You don't dispute that the other two could not perform one or more of those modifications, right? Correct. And the accommodation the other two requested was that they not do them at all, or they make others do their job since they couldn't do them. I don't think they ever said that second part. Well, I thought they said they were going to have somebody else. They had so many police officers that they could have somebody else doing that kind of stuff. Well, that's what I argued. They didn't ask for that. All right. They didn't ask. That's just your argument. So I put your argument in their words then. Okay. All right. So then we're left to argue that they were not essential functions. Correct. And that's your argument. Yes, sir. All right. And if we look at whether they were essential functions, we look at whether the function was essential at the time it was imposed. Correct? Correct. All right. There's a Utah case called Henniger. Yes, there is. It suggests that an essential function analysis intended to second-guess the employer or require it to lower the company's standards is not correct. It also says it says all it's got to be is job-related, uniformly enforced, and consistent with business necessity. Why should I disagree with what my colleagues in the 10th Circuit said? Well, a couple of reasons. One is Cripes versus – Well, but – That's in your circuit. I understand, but these are not modifications for just becoming a police officer, as it was in Cripes. No, that's not true. Cripes, all the people involved were police officers. Well, I understand, but there were age and length of service criteria that kept the people from not doing those new requirements in Cripes. I don't believe that's correct, Ernier. I'm sorry. Okay. They were on modified duty because of their disabilities, and they didn't want to be. They were precluded from going into specialized duties like investigation or training because they couldn't do patrol duties. They had to do a year of patrol before three years of the specialized duty, and they had to do a year of patrol after the specialized duties. And they couldn't do patrol. I understand. So I guess what I'm trying to do, you wanted to give me an argument about that. So I allowed you to do it. But my worry is that this is an adverse action because of disability, the third prong of this particular situation. And in every one of these situations, I have to follow McDonnell Douglas. You have to present your action. Then the government gets to say what they have to say, and then you have to come back on pretext. What is the best you can say about pretext? Okay. First I want to clarify that when the evidence demonstrates that the actions were because of the disability, that the wrongful termination was because of the disability, I don't have to give you pretext. We don't have to do McDonnell Douglas. That's need for the note 10. Dart and France, they're all in the briefs. But even given that, the issue. Well, I can understand that's one area that you want to suggest, but I'll have the government with another case and say just the opposite. So I'm trying to let you respond to the government's argument before they make it. That's where I'm at. I'm trying to get you that opportunity. Okay. But the point is, even on the pretext part, there's no dispute that the only reason these men were terminated was because of their disabilities. That's the only reason. They don't even say that there was another reason. They were terminated because of their disabilities. Now, you're trying to suggest that they could enact these unessential requirements, and that I have to prove that that was a pretext to go out and terminate these people. But is it enough to say I'm out of a job and therefore pretext? You don't say others who didn't have the disabilities got better? You don't say that. You don't say others who had other kinds of disabilities got better? You don't say that. All you say is my people are out of the job and therefore it's pretext. That doesn't seem to meet the standard. But Matthew Cruz himself said, oh, I've got lots of instructors who have disabilities. I have lots of police officers who have disabilities. But they didn't get terminated. Just these four people got affected. Do you have any evidence of a vendetta? I think there is evidence of a vendetta. I mean, we had one of this once happen before, and they all got accommodated. So I don't think that's vendetta. Well, again, if you read their declarations, it started in 2012, and these disabled veterans who have served our country honorably were pulled into the RA process, kicked out of the RA process, told that they were too disabled, told that they weren't disabled enough. It was a nightmare for them, and it was only them. As far as we know, Matthew Cruz says everybody else was fine. It was these four who raised problems. I was going to use your word, but raised problems and raised issues. Other disabled instructors, other disabled police officers, there's no evidence that any of them, though disabled, admittedly disabled, actually met these additional PDs or were terminated or affected. We have no evidence of that. So I think the inferences give us plenty of support for the conclusion that these four men were targeted. But even if they weren't, it goes back to the fact that if these are not essential functions, we don't even get to McDonnell Douglas. We don't have to go there if they had the burden, a high burden, to prove that these were essential functions or essential requirements, and they didn't do that. Matthew Cruz. I've been curious all your time. Oh. Do you want some rebuttal? Yes, please. All right. Thank you. I'll give you a minute afterwards. Thanks. We'll go to the government. Do you have a question? I do not have a question. Go ahead. Good morning. Good morning, Your Honors. May it please the Court. Catherine Parker for the Secretary of the Navy, Carlos Del Toro. This appeal directly implicates the Navy's ability to improve upon and continually evolve its security operations at Navy bases across an entire region. In this case, the ten naval installations in Navy Region Southwest. There's ample evidence supporting those changes. The region's force protection director made a decision based on his experience and his visits to the installations in the region, that the Navy required all of its police officer instructors to not only teach in the classroom, but to also provide on-the-ground law enforcement services. And there are concrete reasons in the record that that was needed. What other things do we have in the record besides the one long affidavit of the one naval officer? The primary evidence is the declaration of Mr. Cruz. Appellant is incorrect in alleging that that's the only evidence. There's also substantial testimony from Mr. Cruz in his deposition. Well, I understand, but everything comes from either a deposition or his testimony. What else do we have?  The position description itself in OPM's discussion about the police officer instructor position, which is in the record, 786-707. That arose out of an earlier challenge by some of these plaintiffs and other individuals asking to be qualified in the instructor series on the GS scale. And OPM looked at it and said, no, this is primarily a police officer job. That decision also bolsters the changes that Matthew Cruz decided to make, a decision that began in 2016. And I'd like to briefly address a couple of arguments that were raised for the first time on appeal and primarily in the reply and here in oral argument. And first, the suggestion that the McDonnell-Douglas standard does not apply. It absolutely applies. The suggestion from the appellant here appears to be that whenever a termination arises out of an individual's disability, there is no potential for summary judgment, that we go straight to trial. And that is absolutely not the law. This court in McGinnis discussed the situation that might give rise to foregoing the McDonnell-Douglas burden shifting. And that's when the appellant has direct evidence of discriminatory motive. And a disability case where this court made that distinction was the France v. Johnson case, where the plaintiff, I apologize, that is an age discrimination case, the plaintiff needs to present direct evidence of a discriminatory motive. And that's the scenario where this court would potentially forego the burden shifting analysis. There is no evidence here, no direct evidence and no circumstantial evidence of discriminatory motive. He suggests that there is because they just couldn't do the job and they can't do it. And they're the only ones who couldn't do it. And if that were the standard, that employees who, based on their disability, couldn't do the essential functions of a job have a case that proceeds to trial, that would completely eliminate most of the United States' disability discrimination framework for looking at these cases. And it's helpful to look at the Supreme Court's and this court's guidance, the Supreme Court in Burdine and this court in Hahn, the reminder to look at the big picture and be reminded of the ultimate issue. The ultimate issue is the plaintiff's burden to prove that the employer is treating some people less favorably because of a protected characteristic. And there's no evidence of anything along those lines here. How do you distinguish cripe? Cripe is very factually different from this case. And the cripe decision itself, it's helpful to look at footnote 12, where the panel in cripe was asked to follow an 11th Circuit case, an 11th Circuit law enforcement case. And the 9th Circuit in cripe looked at that case Holbrook and said, The facts there are so different. The inquiry of what is an essential function is so fact-specific that Holbrook affords us no guidance. And in this case, the differences between cripe and the facts here are so substantial that cripe provides legal standards or provides very little guidance as to how those standards should be applied here. In cripe, the city of San Jose, which had 1,000 police officers, had categorically set aside only 30 of those for any officers with disabilities and had labeled them modified duty assignments. It set up that system as essentially a gateway to all specialized assignments on the force. You had to serve on meat patrol before you could apply for any special assignment on the force. Any special assignment among these 1,000 positions. Nothing like that has happened here. Nothing at all. The Navy has looked at one position, the police officer instructor position, and made a decision that several essential duties needed to be added. It made that decision based on facts on the ground and what was happening on the basis. And then when any employee who made a reasonable accommodation request, the Navy looked at that individual. That individual's disability compared against the essential functions, looked at the reasonable accommodation request, and indeed the fact that the four plaintiffs here had very different outcomes shows just how different this case is from cripe. Our counsel. Yes. I have a question for you. What's the government's position on whether, if we ask you to mediate under the Ninth Circuit's skilled mediators, there would be any chance that a resolution of the case by agreement could be reached if the appellants got some additional thing the government was willing to give? I was not in. I was a counsel of record in the district court litigation, and I don't recall the exact substance of the discussions. We did participate in mediation. The government is always open to engaging in that process. I would involve the Navy in those discussions, and we're always open to talk, essentially. Of course. Thank you. You're welcome, Your Honor. When we talk about the qualifications for employment, it seems to me that you argue in your briefs that that issue was not raised in the district court. There was no argument at all in the district court to the effect that the argument that's being made here is that the physical agility test and the requirement to attend FLETC are not functions or duties. They are qualification standards, and that that puts us into a different legal analysis. That claim wasn't raised in the complaint. That argument wasn't raised in district court. And that's an argument that's very different from the law cited in the reply brief to the effect that, for example, a party can cite a new case on appeal that it didn't cite or a party can amplify an argument on appeal that it kind of put in a footnote in a district court. And that's not the case here. The qualification standard argument was not raised at all, and that's a different theory of liability with different standards and evidentiary burdens. I would point out, however, that the court doesn't need to look at it at all. There's no argument that the function of standing watch is a qualification standard. And also, with respect to FLETC, none of the appellants suffered any adverse consequences arising out of FLETC, so the court need not look at that. The real issue here is whether the sustainment watches are essential functions. There's no question that it is a function and it is a duty. And the Navy has put forth substantial evidence that a change was needed, that this region needed to change how it staffs security operations across 10 installations. And the evidence is specific and compelling as to providing readiness and providing protection on 10 Navy bases. And Matthew Cruz, in his deposition, discusses staffing shortages, and he discusses the fact that there had been active shooter incidents in San Diego at Navy Hospital, and they were fortunately false alarms, but the Navy needs readiness. It needs a full force ready to respond to situations like that. When the government gives its legitimate non-discriminatory reasons, another thing that the appellants challenge is that there's nothing more. I tried to get you to that a little bit before. Nothing more except the affidavit of Officer Cruz. They say you don't have any studies. You don't have any extra, if you will, extrapolations that you've gone through. You're just relying on this. And they say on a disparate impact case that that's what you have to have. Your response is this is a disparate treatment case, and I understand what you're saying. I guess I'm trying to understand, are you required to substantiate the rationale for your duty change? There's no law, no statute, no regulation cited to that effect. The Navy does have the burden of production rather than persuasion as to what the essential functions are. And the declaration and testimony of a regional director who oversees providing security across an entire region absolutely satisfies that burden of production. The concept of data and statistics, as pointed out in the briefing and as Your Honor points out, arises in the context of a disparate impact claim. There is no disparate impact claim, and if there were, it would be the appellant's burden to be providing data and statistics. Mr. Cruz's testimony, his declaration is bolstered by his testimony. And none of the testimony that the appellants rely on here calls into question a region-wide forward-looking decision that was made to change a position description in order to increase readiness across the region. This court can and should give credence to all of the testimony cited by the appellants, but it just doesn't speak to the relevant issue. All of that testimony is from folks on the ground supervising the instructors, testifying about their perception about how things had been done. None of it speaks to what changes needed to be made going forward. That's the testimony from the other witnesses? That's what you're talking about? That's what I'm talking about, the testimony from Mr. Horton and Mr. Stanton and Amy Stingley and Kimberly Bruce. None of these folks had the high-level region-wide forward-looking perspective. Well, and they weren't involved in the determination, right? I'm sorry? They weren't involved in the determination either. That's exactly correct. And it wasn't their job to be involved. It wasn't their job to decide what changes need to be made to meet staffing challenges, to meet security challenges. So it's not surprising that they didn't know. It's just not relevant to the issue of whether these changes were necessary. And they absolutely were necessary. Do you have any questions, Judge Henderocker? No questions. Any more questions, Judge Gould? No questions from me. Do you have anything more you'd like to say? That's all I have, Your Honors. Thank you very much. Thank you very much. We appreciate your argument. Ma'am, we'll give you a minute. I'll talk fast. I know you went over. I know Judge Gould would be very merciful. I know him. So we'll give you a minute. Okay. As to the detailed basis for the decision, we have none. We don't know why. There's no explanation. But it does. It does. Even Hennegar says it has to be. And Hennegar, the detailed explanation was because the paramedics in the infirmary were exposed to prisoners every day and potential violence every day. The risk was there every day. Do you, then, agree to this? That doesn't matter. Well, I know you say it doesn't matter. Just a minute. Just a minute. It seems to me that in this particular situation, the way it's laid out, what the Navy should do and shouldn't do, and how they can do it and how they couldn't do it, the union got a big part, got to play a part in that. Christ. I know what Cripes said. Okay. I'm just trying to make sure that you understand that here it isn't as if they did all this with it and didn't tell anyone. But we don't know what the union said. We don't know what they negotiated. He just presented it. He got approval. We don't know what happened in between, is the problem. And the other on-the-ground witnesses, I'm sorry, they're directly on the ground. They know. Their time is up, and I think I understand what you're going to say about that. And I, frankly, my own self, I'm not speaking for my colleagues, don't think that makes them involved. But nonetheless, I know what you're going to say because I read your brief. Thank you. Your time is up. Thank you, sir. Case 2355-201, Simmons v. Del Toro, is submitted. Thank you both for your argument.
judges: GOULD, SMITH, UNKNOWN